UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TERRY GENE BOLLEA professionally
known as HULK HOGAN

        Plaintiff,

                                 Case No.:  8:13-cv-0001-T-26AEP

vs.

HEATHER CLEM; GAWKER MEDIA,       **DISPOSITIVE MOTION**
LLC aka GAWKER MEDIA; GAWKER
MEDIA GROUP, INC. aka GAWKER
MEDIA; GAWKER ENTERTAINMET,
LLC; GAWKER TECHNOLOGY, LLC;
GAWKER SALES, LLC; NICK DENTON;
A.J. DAULERIO; KATE BENNERT AND
BLOGWIRE HUNGARY SZELLEMI
ALKOTAST HASZNOSITO KFT,

        Defendants.

_____/

**DEFENDANT GAWKER MEDIA, LLC'S MOTION TO DISMISS**
**PLAINTIFF'S COMPLAINT FOR FAILURE TO STATE A CLAIM**

      Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 3.01, by and

through the undersigned counsel, defendants Gawker Media, LLC ("Gawker") hereby moves this

Court for an order dismissing plaintiff's Complaint ("Complaint" or "Compl.") against it in its

entirety for failure to state a claim upon which relief may be granted.  As grounds for its motion,

Gawker states as follows:

      1.     Plaintiff alleges various claims arising out of the publication on www.gawker.com

of a report (the "Gawker Story") about a video of plaintiff, a well-known celebrity, cheating on

his wife with the wife of his best friend with the friend's blessing (the "Video"), together with

brief excerpts of the Video (the "Excerpts").

1

2.      Plaintiff fails to state a claim upon which relief can be granted because (a) defendants' conduct involves speech about a matter of public concern and is therefore shielded from liability by the First Amendment; and (b) plaintiff fails as a matter of law to establish the elements of each of his causes of action.

3.      For these reasons, Gawker moves the Court to dismiss in their entirety all claims asserted against it (and for the same reasons to dismiss all claims against the remaining Gawker Defendants, who have not yet been served, but as to which the same basis for dismissal applies).

4.      This motion is based on the following Memorandum of Law, and the record in *Bollea v. Gawker Media LLC, et al.*, No. 8:12-cv-02348-JDW-TBM (M.D. Fla.) ("*Bollea I*"), including the Declaration of Rachel Fugate ("Fugate Decl."), and the exhibits thereto.[1]  As explained in note 2 *supra*, the Court may take judicial notice of these materials.

## MEMORANDUM OF LAW

### A.    Factual Background

Although the plaintiff's allegations are known to the Court from plaintiff's pleadings, TRO Application (Dkt. 4) and three motions for injunctive relief (Dkt. 5, 54, 60) in *Bollea I*, Gawker briefly summarizes plaintiff's Complaint in this action.  According to that Complaint, "Plaintiff has devoted a tremendous amount of his time and effort to developing his career as a professional champion wrestler, motion picture actor, and television personality, and to developing his universal goodwill, reputation and brand."  Compl. ¶ 32; *see also id.* ¶ 77 (same). Plaintiff alleges that this respectable public image has been damaged by the posting on the Internet of brief excerpts from a longer videotape depicting him having "consensual sexual relations with [Heather] Clem," that he concedes was filmed in 2006, roughly six years ago,

---

[1] As directed by the Court, the undersigned has not resubmitted filings already on the docket in *Bollea I*, but incorporates them by reference into the record in this action.  All references to docket numbers refer to *Bollea I*.

Compl. ¶¶ 1, 26, at which time plaintiff was still married to his wife of many years (Linda

Hogan).  Although the Complaint refers in places to Clem as "an anonymous woman," Compl.

¶ 28, as he had in his Complaints in the *Bollea I*, plaintiff's Complaint elsewhere repeatedly

confirms that he was having sex with the wife (Heather Clem) of his best friend (Bubba the Love

Sponge, himself a well-known radio personality, also known as Todd Alan Clem), with his best

friend's blessing, in the Clems' bedroom, *id.* ¶¶ 1, 26-27, 29, 38, 50, 57-58, 67, 103, Prayer for

Relief ¶¶ 3-7.

Plaintiff further alleges that he "had no knowledge" that the "activity being depicted in

the Video was being recorded."  Compl. ¶ 2.  In addition, Plaintiff does not allege that Gawker

played any part in making the initial tape; indeed, he filed a separate lawsuit in Florida Circuit

Court against the Clems for recording it.  *See* Fugate Decl. Ex. 1.[2]  An Amended Complaint in

that action, asserting claims against Mrs. Clem and the Gawker Defendants, was removed to this

Court to initiate this action.

---

[2] In adjudicating this motion, the Court may properly take judicial notice of (a) the Gawker Story and the Excerpts as documents placed at issue in plaintiff's Complaint; (b) judicial records in this case, in the *Bollea I*, and the case initially brought by plaintiff against the Clems in state court; (c) other news reports demonstrating either that the contents of the Gawker Story or Excerpts were previously made public or that the Gawker Story was newsworthy, given that such articles are not offered for the truth of the matter asserted and their authenticity is not subject to any legitimate challenge.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal."); *Universal Express, Inc. v. SEC*, 177 F. App'x 52, 53 (11th Cir. 2006) ("Public records are among the permissible facts that a district court may consider" at the motion to dismiss stage); *Oxford Asset Mgmt., Ltd v. Jaharis*, 297 F.3d 1182, 188 (11th Cir. 2002) (taking notice of multiple documents outside the pleadings on motion to dismiss, including article and press release, "to show their contents, not to prove the truth of matters asserted therein"); *see also Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (at motion to dismiss stage, "[c]ourts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true'") (citation omitted); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (on motion to dismiss, "it is proper to take judicial notice of the *fact* that press coverage . . . contained certain information, without regard to [its] truth").  The Court may also take judicial notice of plaintiff's admissions in connection with his various motions for a temporary restraining order and preliminary or interim injunctive relief in *Bollea I*.  *See Guirguis v. Dunkin' Donuts Inc.*, 2010 WL 715514, at *2 (D.N.J. Mar. 1, 2010) (considering a prior admission in ruling on motion to dismiss); *Palm Beach Int'l., Inc. v. Salkin*, 2010 WL 5418995, at *6 (S.D. Fla. Dec. 10, 2010) ("'Normally, factual assertions in pleadings . . . are considered to be judicial admissions conclusively binding on the party who made them.'") (citation omitted).  Alternatively, pursuant to Fed. R. Civ. P. 12(d), the Court may convert the portions of this motion relying on such undisputed facts into a motion for summary judgment.

As to Gawker, plaintiff alleges that "[o]n or about October 4, 2012," the Gawker Site published the Gawker Story and a link to the Excerpts.  Compl. ¶ 28.  The Excerpts begin with Bubba the Love Sponge encouraging his wife and plaintiff to have sex while he waits in another room.[3]  They also depict plaintiff receiving a phone call and deciding not to take it, and principally depict conversations between plaintiff and Mrs. Clem in which plaintiff stated *inter alia*:  that he should instead be at home; that he had been working out; that he just ate, felt "like a pig" and was out of breath; and that his son's girlfriend's twin sister had proposed a liaison with plaintiff.  The Excerpts total one minute and 41 seconds and include fewer than 10 seconds of sexual activity – all in grainy, surveillance camera footage.[4]  Noting that the Video had been "circulated last April" and the subject of prior reports on numerous celebrity news websites, the Gawker Story's text offers a humorous description of both the sex and the conversation depicted in the Video, comments on the public's fascination with celebrities' sex lives, attempts to capture both the disappointment and satisfaction of knowing that "celebrity sex" is often ordinary, and repeatedly notes that the Video appears to be depicting plaintiff's affair with his best friend's wife with his best friend's blessing – a fact subsequently confirmed by plaintiff.

The Video had been the subject of widespread news coverage prior to Gawker's post, including graphic description of its contents and posting of images from the Video.  *See* Fugate Decl. Exs. 3-15; Dkt. 66 (12/21/12 Order) at 5 (reciting same).  Despite his current claims about his public image, some six months prior to Gawker's post, plaintiff admitted in an interview that he had no idea who the woman in the sex tape was because he had sex with a lot of women

---

[3] *See* http://gawker.com/5948770/even-for-a-minute-watching-hulk-hogan-have-sex-in-a-canopy-bed-is-not-safe-for-work-but-watch-it-anyway.

[4] The sexual encounter appears to have been recorded on a stationary camera as part of a home surveillance system.  *See also* http://www.youtube.com/watch?v=IwPQRPHTMPA at 4:35-5:14 (describing surveillance system in Clems' home).  *See also* Dkt. 66 (12/21/12 Order) at 8 & n.6 (noting that Video was of "poor quality" and that Excerpts were "carefully edited" to "less than two minutes of the thirty minute video of which less than ten seconds depicted explicit sexual activity").

during that period – adding, "'During that time, I don't even remember people's names, much less girls.'"  *Id.* Ex. 14.  Moreover, in 2009, long before reports of the Video surfaced, plaintiff published an autobiography, *My Life Outside the Ring*, in which he described, *inter alia*, an affair he had with a different woman while still married to Linda Hogan, admitting that the details of the affair "became national news."  *Id.* Ex. 2; *see also id.* Ex. 15 (review noting same).  Widespread public interest in and discussion of Hogan's sexual encounter with Mrs. Clem has continued since the publication of the Gawker Story, including news reports of various statements by plaintiffs and his representatives, as well as often conflicting statements by Bubba the Love Sponge about plaintiff's knowledge of the taping and role in the public release of the Video.  *See* Fugate Decl. Exs. 17-24; Dkt. 28 at 4 and nn.10-14.  Despite claiming that the Gawker Story invades his privacy, plaintiff both actively participated in this public discussion and repeatedly included the Gawker Story in the Court's public docket in his earlier filings.  *See, e.g.*, Dkt. 4-1, Ex. D at 8-11; *see also* Dkt. 54-2 (attaching four additional copies).

**B.      Prior Proceedings**

As this Court is aware, after the Excerpts were posted, plaintiff moved for a temporary restraining order and a preliminary injunction.  *See* Dkt. 4, 5.  The Court denied his request for a TRO, *see* Dkt. 8, and subsequently denied his request for an injunction, *see id.* Dkt. 47; *Bollea v. Gawker Media, LLC*, 2012 WL 5509624 (M.D. Fla. Nov. 14, 2012), finding that:

> Plaintiff's public persona, including the publicity he and his family derived from a television reality show detailing their personal life, his own book describing an affair he had during his marriage, prior reports by other parties of the existence and content of the Video, and Plaintiff's own public discussion of issues relating to his marriage, sex life, and the Video all demonstrate that the Video is a subject of general interest and concern to the community.

*Id.* at *3; Dkt. 66 (12/21/12 Order) at 5 n.3 (same).  As such, the Court held that Gawker's "decision to post **excerpts** of the Video online is appropriately left to editorial discretion" and

5

protected by the First Amendment. *Bollea*, 2012 WL 5509624, at *3 (emphasis in original). In its order denying that motion, the Court expressly relied on authority granting summary judgment to a celebrity plaintiff asserting privacy claims in "analogous circumstances" where excerpts of a similar tape were, as here, the subject of a news report. *Id.* at *2 n.2 & *3 n.5 (citing *Michaels v. Internet Entm't Grp., Inc.*, 1998 WL 882848 (C.D. Cal. Sept. 11, 1998) ("*Michaels II*")).[5] The Court subsequently denied plaintiff's Motion for Injunction Pending Appeal for the same reasons. *See* Dkt. 61. Plaintiff had filed an amended complaint also asserting a claim for copyright infringement (which is not reasserted in this action). *See* Dkt. 42 ¶¶ 77-86. The Court also denied Plaintiff's [second] Motion for Preliminary Injunction based on that copyright infringement claim. *See* Dkt. 66.

Defendants had filed a motion to dismiss plaintiff's First Amended Complaint, which was fully briefed and pending when plaintiff voluntarily dismissed the *Bollea I* and refiled his claims against the Gawker Defendants in state court.[6] Given that Gawker played no role in recording the original Video, the prior extensive news reporting about it, the public interest in the Video, and the limited excerpts that Gawker posted, plaintiff's claims should be dismissed in their entirety. Doing so would not, as plaintiff previously contended, mean that "the right to privacy ceases to exist in America," Dkt. 67 (Prior MTD Opp.) at 2, but, rather, simply involves the application of well-established principles under the First Amendment and Florida law.

---

[5] In his Opposition to Defendants' Motion to Dismiss in *Bollea I*, Dkt. 67 (Prior MTD Opp.) at 3, plaintiff contended that the Court's findings at the preliminary injunction stage "have no bearing on the present motion." That is incorrect with respect to the Court's *legal* conclusions, as distinguished from any *factual* findings, and defendants rely solely on the former, including the legal determination that the Gawker Story and Excerpts involved a matter of public concern. *See, e.g.*, *Michigan v. U.S. Army Corps of Eng'rs*, 2012 WL 6016926, at *7 (N.D. Ill. Dec. 3, 2012) ("rulings on 'pure issues of law' at the preliminary injunction stage are binding later in the litigation"); *Tamburri v. Suntrust Mortg., Inc.*, --- F. Supp. 2d ---, 2012 WL 2367881, at *10 (N.D. Cal. June 21, 2012) (legal determination made at preliminary injunction stage required denying subsequent motion to dismiss).

[6] Plaintiff had also appealed to the Eleventh Circuit the denial of his first Motion for Preliminary Injunction in the *Bollea I*. Dkt. 49. In the Court of Appeals, he also filed an emergency Motion for Injunction Pending Appeal, which was also fully briefed at the time he dismissed the *Bollea I* and that appeal.

## ARGUMENT

### I.    PLAINTIFF'S CLAIMS ARE BARRED BY THE FIRST AMENDMENT.

#### A.    The First Amendment Protects Speech About a Matter of Public Concern.

In *Snyder v. Phelps*, the Supreme Court recently reaffirmed that "[t]he Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits," including claims for intentional infliction of emotional distress and invasion of privacy.  131 S. Ct. 1207, 1215 (2011) (citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50-51 (1988)).  Here, because the publication involves a matter of public concern, as this Court has already held, plaintiff's claims fail as a matter of constitutional law.

In *Snyder*, the Supreme Court considered whether the First Amendment "shield[ed]" from tort liability members of the Westboro Baptist Church who picketed near a soldier's funeral service carrying clearly offensive signs that said, among other things, "God Hates Fags," "You're Going to Hell," "God Hates the USA/Thank God for 9/11," "Thank God for Dead Soldiers," and "God Hates You."  131 S. Ct. at 1213.  The soldier's father brought a number of tort claims against the Church and its members, including claims for intentional infliction of emotional distress and invasion of privacy.  Because defendants' speech addressed a matter of public concern, the Court held, the First Amendment barred plaintiff's claims.  *Id.* at 1215.

"Speech on matters of public concern," the Supreme Court explained, "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Id.* (internal quotation marks and citations omitted).  Moreover, the Court emphasized, what constitutes a matter of "public concern" must be construed broadly, lest "courts themselves . . . become inadvertent censors."  *Id.* at 1216.  Thus, speech deals with a matter of public concern when, for example, "it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."  *Id.* (internal marks and citations omitted).  "The

7

arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'" *Id.* (citation omitted). *See also Bollea*, 2012 WL 5509624, at *2 n.3 (matters of public concern "'extend[] beyond subjects of political or public affairs to all matters of the kind customarily regarded as 'news' and all matters giving information to the public for purposes of education, amusement or enlightenment'") (quoting *Anonsen v. Donahue*, 857 S.W.2d 700, 703-04 (Tex. App. 1993)). Once a court determines that a defendant's speech addresses a matter of public concern, it "cannot be restricted simply because it is upsetting or arouses contempt." *Snyder*, 131 S. Ct. at 1219. *See also Time, Inc. v. Hill*, 385 U.S. 374, 388 (1967) ("'[Drawing a] line between the informing and the entertaining is too elusive for the protection of . . . freedom of the press.'") (citation omitted).

As it relates to a claim for intentional infliction of emotional distress, the Court noted that the potential for censoring speech is particularly real:

> The jury here was instructed that it could hold Westboro liable for intentional infliction of emotional distress based on a finding that Westboro's picketing was "outrageous." "Outrageousness," however, is a highly malleable standard with an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression. In a case such as this, a jury is unlikely to be neutral with respect to the content of the speech, posing a real danger of becoming an instrument for the suppression of . . . sometimes unpleasant expression.

*Snyder*, 131 S. Ct. at 1219 (internal marks and citations omitted). Because "[s]uch a risk is unacceptable," we must tolerate "even outrageous speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Id.* (citation omitted). Similarly, with respect to plaintiff's invasion of privacy claims, the Court explained that, "[i]n most circumstances, 'the Constitution does not permit the government to decide which types of otherwise protected speech are sufficiently offensive to require protection.'" *Id.* at 1220 (citations omitted).

8

Under these principles, each of the state law claims plaintiff asserts is significantly cabined by the First Amendment, both by itself and by having been incorporated into the elements of the torts.[7]  *See Snyder*, 131 S. Ct. at 1220 (rejecting plaintiff's intrusion upon seclusion claim on First Amendment grounds); *Post-Newsweek Stations Orlando, Inc. v. Guetzloe*, 968 So. 2d 608, 612 (Fla. 5th DCA 2007) (noting that, under Supreme Court precedent, "privacy will rarely trump the First Amendment"); *Tyne v. Time Warner Entm't Co.*, 901 So. 2d 802, 810 (Fla. 2005) (statutory right of publicity subject to First Amendment limitation for works involving public interest that do not use a person's name or likeness to promote a good or service); *Falwell*, 485 U.S. at 56-57 (rejecting intentional infliction claim on First Amendment grounds).[8]  The Gawker Story and the Excerpts were unquestionably of "'general interest and of value and concern to the public.'"  *Snyder*, 131 S. Ct. at 1216 (citation omitted).  Indeed, with respect to the Excerpts, this Court has already so held.  *See Bollea*, 2012 WL 5509624, at *3 ("the Video is a subject of general interest and concern to the community.").

## B.   Plaintiff's Contentions that a *Constitutional* Right to Privacy Must Be *Balanced in Individual Cases* with First Amendment Protections is Erroneous.

In his Opposition to Defendants' Motion to Dismiss in the *Bollea I*, plaintiff contended that (a) "the right to privacy" is a "fundamental constitutional right" on equal footing with the First Amendment, and (b) the Court must conduct a fact-specific balancing of those competing rights in individual cases.  *See* Dkt. 67 at 1, 4-7.  Plaintiff is wrong on both fronts.

---

[7] While generally courts avoid reaching constitutional issues if they can be decided on common law or statutory grounds, in cases involving speech, the First Amendment imposes both a bar to liability and substantive limitations on the causes of action such that addressing those limitations is appropriate as an initial matter.

[8] Plaintiff's Complaint asserts a new claim against Gawker for disseminating content allegedly recorded in violation of Florida's Wiretap Act, Compl. ¶¶ 100-108 (citing Fla. Stat. § 934.10), and invokes similar provisions of Florida's Video Voyeurism Statute, Compl. ¶ 4 (citing Fla. Stat. § 810.145).  As explained in greater detail in Part II.F. *infra*, a long line of Supreme Court authority affords First Amendment protection for truthful speech about a matter of public concern – even where it is unlawfully obtained by others – including in the specific context of dissemination of recordings made in violation of the Wiretap Act.  *See Bartnicki v. Vopper*, 532 U.S. 514 (2001).

In addition to asserting a violation of a constitutional right of privacy in connection with his intrusion claim, *see* Compl. ¶¶ 6, 67, plaintiff invokes a passing reference in *Toffoloni v. LFP Publishing Group, LLC*, 572 F.3d 1201, 1207-08 (11th Cir. 2009), in support of these contentions.  However, that one passage – including its citation to a century-old Georgia decision, *see id.* at 1205 (citing *Pavesich v. New England Life Ins. Co.*, 50 S.E. 68, 71 (Ga. 1905)) – did not purport to sweep away the long line of Supreme Court's precedent making clear that privacy rights, otherwise enforceable at common law or under statute, obtain constitutional status under the Due Process Clause *only* when violated by a state actor.  *See, e.g.*, U.S. Const., amend. XIV ("nor shall *any state* deprive any person of life, liberty, or property, without due process of law") (emphasis added); *Toffoloni*, 572 F.3d at 1205 ("Violation of the right of publicity is a state tort.").[9]

Indeed, in *Bartnicki*, 532 U.S. at 534, the Supreme Court rejected petitioner's claim that privacy considerations – there, involving cell phone conversations protected by the federal Wiretap Act, 18 U.S.C. § 2511– rose to a constitutional right on the same footing as the First Amendment, instead confirming that "privacy concerns give way when balanced against the interests" protected by the First Amendment.  *Id.* at 534.  The Court reiterated that conclusion in *Snyder* – two years after *Toffoloni* – when it relied on the First Amendment to bar privacy claims by a non-state actor.  *See* 131 S. Ct. at 1220.

---

[9] *See Griswold v. Connecticut*, 381 U.S. 479 (1965) (recognizing marital right of privacy against legislation prohibiting contraceptives); *Roe v. Wade*, 410 U.S. 113 (1973) (same for laws restricting abortion); *Lawrence v. Texas*, 539 U.S. 558 (2003) (same for criminal statute prohibiting homosexual sex); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (same for criminal statute prohibiting private possession of obscenity) ("For also fundamental is the right to be free, except in very limited circumstances, from unwanted *governmental* intrusions into one's privacy.") (emphasis added); *see also Anderson v. Suiters*, 499 F.3d 1228 (10th Cir. 2007) (news broadcast including excerpts of videotaped footage of rape of plaintiff, received from police officer, was not conduct "under color of state law"); *Peavy v. Dallas Indep. Sch. Dist.*, 57 F. Supp. 2d 382, 389-90 (N.D. Tex. 1999) (recipient of illegal recording who read transcript into record at school board meeting not engaged in governmental action).

Moreover, any balance between common law privacy interests and First Amendment rights is not, as plaintiff would have it, undertaken on a fact specific basis in each case, *see* Dkt. 67 at 1, 5, particularly given the risk of punishing or chilling unpopular or controversial speech. Rather, the balance is achieved *categorically* either by requiring as an element of the tort that the expression not involve a matter of public concern or by affording defendants the so-called "newsworthiness" defense, which *Toffoloni* itself confirms.  *See* 572 F.3d at 1208 ("In order to navigate between" privacy rights and First Amendment rights, "the Georgia courts have adopted a 'newsworthiness' exception to the right of publicity.").  Because, as this Court has already held, Gawker's use of brief Excerpts in connection with a story directly reporting on plaintiff's affair with his best friend's wife – with his best friend's blessing – is directly related to its subject, that use addresses a matter of public concern.  And, because the First Amendment protects such speech about matters of public concern, plaintiff's claims must fail.[10]

## II.   PLAINTIFF'S STATE LAW CLAIMS ALSO FAIL AS A MATTER OF LAW.

Even if plaintiff's claims were not constitutionally infirm, which they are, they fail independently as a matter of state law.

### A.   Publication of Private Facts (Third Cause of Action)[11]

To establish the tort of publication of private facts, plaintiff must show (1) the publication, (2) of private facts, (3) that are highly offensive, and (4) that are not of public

---

[10] Plaintiff's related assertion that "it is inappropriate to resolve these issues on a motion to dismiss," Dkt. 67 at 6, is also incorrect.  Indeed, *Toffoloni* did just that, as plaintiff acknowledges, *see id.* (conceding *Toffoloni* was resolved at the motion to dismiss stage); *Toffoloni*, 572 F.3d at 1210-12 (determining newsworthiness as a matter of law); *Toffoloni v. LFP Publ'g Group, LLC*, 2010 WL 4877911, at *3 (N.D. Ga. Nov. 23, 2010) (noting, after remand, that "Whether the photographs are protected as newsworthy is a question of law which the Eleventh Circuit has already decided."), *aff'd*, 483 F. App'x 561 (11th Cir.), *cert. denied*, 2012 WL 4834393 (U.S. Dec. 10, 2012).

[11] Plaintiff's first two causes of action are asserted solely against Heather Clem.

concern.  *See, e.g.*, *Cape Publ'ns, Inc. v. Hitchner*, 549 So. 2d 1374, 1377 (Fla. 1989) (citing

*Restatement (Second) of Torts* § 652D).  This claim fails for at least two independent reasons.

First, the facts were not private at the time the Gawker Story was posted, but had been

widely disseminated prior to that time in both news reports and photographs.  *See* Fugate Decl.

Exs. 2-16; *see also Bollea*, 2012 WL 5509624, at *3 (noting that plaintiff's own book described

a prior affair and other prior reports by third parties detailed content of Video).  It is well settled

that "[r]epublication of facts already publicized elsewhere cannot provide a basis for an invasion

of privacy claim."  *Heath v. Playboy Enters., Inc.*, 732 F. Supp. 1145, 1149 (S.D. Fla. 1990); *see

also Lee v. Penthouse Int'l Ltd.*, 1997 WL 33384309, at *6 (C.D. Cal. Mar. 19, 1997) (no private

facts claim for publishing previously disclosed sexually intimate photographs of Tommy Lee and

Pamela Anderson because "'there can be no privacy with respect to a matter which is already

public'") (citation omitted).  Because the facts disclosed were already public, plaintiff cannot

state a claim for publication of private facts as a matter of law.

Second, the Gawker Story and accompanying Excerpts involve a matter of public

concern.  As the Florida Supreme Court has emphasized:  "the requirement of lack of public

concern is a formidable obstacle" which "has been recognized . . . as being so broad as to nearly

swallow the tort."  *Hitchner*, 549 So. 2d at 1377 (dismissing invasion of privacy claims where

facts were a matter of public concern).  *See also Woodard v. Sunbeam Television Corp.*, 616 So.

2d 501, 503 (Fla. 3d DCA 1993) ("the publication of private facts is not an invasion of privacy

where these facts are also of public concern.").  Here, as this Court has already held, there can be

no doubt that the Gawker Story and Excerpts are a matter of public interest and concern.  *Bollea*,

2012 WL 5509624, at *3; Dkt. 66 (12/21/12 Order) at 5 n.3 (same).  *See also Eastwood v.

Superior Court*, 198 Cal. Rptr. 342, 351 (Cal. App. 1983) ("the purported romantic

12

involvements" of celebrities are "matter[s] of public concern"); *Restatement (Second) of Torts* § 652D cmt. g (matters of public concern include "news" as "publishers and broadcasters have themselves defined the term" including "matters of genuine, even if more or less deplorable, popular appeal").  Particularly in light of the image plaintiff purports to convey to the public, the fact he cheated on his own wife with the wife of his best friend – another celebrity – with the friend's blessing and while he waited in another room, speaks directly to his character and the image he claims to have cultivated.

In his various motions in *Bollea I*, plaintiff relied heavily on *Michaels v. Internet Entertainment Group, Inc.*, 5 F. Supp. 2d 823 (C.D. Cal. 1998) ("*Michaels I*").  *See, e.g.*, Dkt. 54 at 3, 6-9, 14.  There, however, the defendant was simply selling a complete copy of a sex tape involving Bret Michaels and Pamela Anderson, and, as such, was engaged in "purely commercial speech."  *Bollea*, 2012 WL 5509624, at *3 (citing *Michaels*, 5 F. Supp. 2d at 834-35).  In circumstances more analogous to the Gawker Story, the same court subsequently found there was no actionable invasion of privacy by another defendant, which had broadcast a news report about that same tape, together with a series of excerpts, because the report constituted a matter of public concern.  *See Michaels II*, 1998 WL 882848, at *10 (because plaintiff "is a voluntary public figure" and the purportedly "private matters broadcast bore a substantial nexus to a matter of public interest," privacy claim "fails as a matter of law").  Other courts considering similar purportedly private depictions of nudity or sex have drawn the same line.  *See Lee*, 1997 WL 33384309, at *5 ("the sex life of Tommy Lee and Pamela Anderson Lee is . . . a legitimate subject for an article by *Penthouse*" and sexually explicit images of the couple accompanying the article were "newsworthy," especially given prior reports and statements by plaintiffs about their sex lives); *Jones v. Turner*, 23 Media L. Rep. (BNA) 1122, 1995 WL 10611 (S.D.N.Y. Feb. 7,

13

1995) (refusing to enjoin publication of nude photographs of Paula Corbin Jones in *Penthouse* magazine where photographs bore relationship to accompanying article and article involved matter of public interest).[12]

At bottom, plaintiff asks this Court to judicially enforce the favorable image he and his publicists have tried to advance and to suppress or punish additional information others put forward that calls that image into question.  But for important societal reasons, "the judgment of what is newsworthy is primarily a function of the publisher, not the courts."  *Heath*, 732 F. Supp. at 1149 n.9.  *Accord Bollea*, 2012 WL 5509624, at *3 ("Defendants' decision to post **excerpts** of the Video online is appropriately left to editorial discretion") (emphasis in original).  *See also Cape Publ'ns, Inc. v. Bridges*, 423 So. 2d 426 (Fla. 5th DCA 1982) (publication of photograph of plaintiff clad only in a dish towel, which illustrated report about abduction and rescue, held to be of legitimate public concern); *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 102 n.9 (2d Cir. 2000) ("In media cases, the scope of what is 'arguably within the sphere of public concern' has been held to be extraordinarily broad with great deference paid to what the publisher deems to be of public interest.") (citation omitted).  Accordingly, this claim must be dismissed as a matter of law for this reason as well.

---

[12] Although *Toffoloni* addressed a right of publicity claim, not the publication of private facts, its conclusion hews this same line.  There, the Court found twenty-year-old modeling photographs of a female wrestler not newsworthy because they were unrelated to the "incident of public concern" – namely, her murder.  572 F.3d at 1211.  But the Court of Appeals confirmed that publication of photographs that are *related to* a news report about a matter of public concern *are* unquestionably protected.  *Id.* (citing as an example *Waters v. Fleetwood*, 91 S.E.2d 344 (Ga. 1956) (finding no invasion of privacy from newspaper's publication of gruesome photographs of body of murdered child "as illustrative of an article about her murder and the subsequent investigation" because they were "directly related to the 'incident of public interest' – the child's death")).  Recognizing that it was a close question even in the very different circumstances of *Toffoloni*, the Eleventh Circuit in a later opinion vacated the jury's $19.6 million punitive damage award because of defendant's good faith belief that their use of the nude photographs at issue was newsworthy.  *See Toffoloni v. LFP Publ'g Group, LLC*, 483 F. App'x 561, 563-64 (11th Cir.) (*per curiam*) ("*Toffoloni II*") (defendant's employees "honestly and reasonably (albeit mistakenly) believed at the time that the photographs fit under the newsworthiness exception to the right of publicity"), *cert. denied*, 2012 WL 4834393 (U.S. Dec. 10, 2012).

14

**B.      Intrusion Upon Seclusion (Fourth Cause of Action)**

To state a claim for intrusion upon seclusion, a plaintiff must allege that defendants "physically or electronically intrud[ed] into one's private quarters." *Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 158 (Fla. 2003) (citation omitted).[13]  *See also, e.g.*, *Spilfogel v. Fox Broad. Co.*, 433 F. App'x 724, 726 (11th Cir. 2011) (*per curiam*) ("Under Florida law, . . . tort [of intrusion] requires intrusions 'into a "place" in which there is a reasonable expectation of privacy.'") (citation omitted); *Stasiak v. Kingswood Co-Op, Inc.*, 2012 WL 527537, at *2 (M.D. Fla. 2012) (same); *Oppenheim v. I.C. Sys., Inc.*, 695 F. Supp. 2d 1303, 1308 (M.D. Fla. 2010) (same), *aff'd*, 627 F.3d 833 (11th Cir. 2010).  Plaintiff alleges he was surreptitiously videotaped without his knowledge or consent (albeit not in his own "private quarters," but those of the Clems).  *See, e.g.*, Compl. ¶¶ 1, 26.  He does not allege, however, that Gawker (or the other Gawker Defendants) participated in any way in creating that Video or any other fact that would constitute an actionable intrusion.  Instead, he claims that by "acquiring, viewing, editing, posting, publishing, distributing, disseminating and exploiting" the Video, Gawker intruded upon his seclusion.  Compl. ¶ 68.  As the above authorities make clear, however, that is insufficient to state a claim for intrusion, and therefore plaintiff's intrusion claim should be dismissed with prejudice as a matter of law.[14]

---

[13] When the Florida Supreme Court later held in *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098 (Fla. 2008), that Florida does not recognize the false light tort, it labeled *Ginsberg*'s passing mention of false light as *dicta*, but without in any way affecting *Ginsberg*'s discussion of the requirements for establishing intrusion.  *Id.* at 1103 & n.7.

[14] In *Bollea I*, plaintiff had erroneously asserted that intrusion is governed by *Restatement (Second) of Torts* § 652B, and is therefore not limited to physical or electronic intrusions, but extends to "his private affairs or concerns."  Dkt. 67 (Prior MTD Opp.) at 14-15 & n.10.  However, as this Court has already recognized, "§ 652B has not been adopted in Florida"; rather, "the Florida Supreme Court [has] defined intrusion as 'physically or electronically intruding into one's private quarters,'" which "is significantly narrower than 'one who intrudes physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns.'"  *Oppenheim*, 695 F. Supp. 2d at 1308 n.2 (quoting *Ginsberg*, 863 So.2d at 1162).

## C.      Common Law Right of Publicity (Fifth Cause of Action)

In analyzing right of publicity claims, courts in Florida have found that the common law right of publicity is "substantially identical" to the statutory right under Fla. Stat. § 540.08.  *See Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1320 n.1 (11th Cir. 2006).  *See also Fuentes v. Mega Media Holdings, Inc.*, 721 F. Supp. 2d 1255 (S.D. Fla. 2010) (employing § 540.08 analysis to dismiss common law right of publicity claim); *Lane v. MRA Holdings, LLC*, 242 F. Supp. 2d 1205 (M.D. Fla. 2002) (same).  Under either, a plaintiff must establish that his name, image, or likeness was used for a "commercial" purpose.  *See* Fla. Stat. § 540.08; *Fuentes*, 721 F. Supp. 2d at 1261.  This he cannot do.

To establish a commercial purpose, Florida state and federal courts have uniformly held that plaintiff must show his "name or likeness is used to directly promote a commercial product or service, *separate and apart* from the publication [at issue]."  *Fuentes*, 721 F. Supp. 2d at 1258 (emphasis in original).  *See also Lane*, 242 F. Supp. 2d at 1212 (statutory right of publicity prohibits "using a person's name or likeness to directly promote a product or service"); *Epic Metals Corp. v. CONDEC, Inc.*, 867 F. Supp. 1009, 1016 (M.D. Fla. 1994) (same); *NFL v. The Alley, Inc.*, 624 F. Supp. 6, 10 (S.D. Fla. 1983) (same).  As the court explained in *Loft v. Fuller*, 408 So. 2d 619, 622-23 (Fla. 4th DCA 1981), publishing a plaintiff's name, likeness, or image is actionable "not simply because it is included in a publication that is sold for a profit, but rather because of the way it associates the individual's name or his personality with something else."[15]

---

[15] In *Toffoloni*, rather than limiting right of publicity claims to uses that "directly promote a good or service" as required under Florida law, the Eleventh Circuit appeared to interpret Georgia law to apply more broadly to any use "for the financial gain" of defendant.  572 F.3d at 1205.  Even still, the Court of Appeals repeatedly emphasized that the tort protects the plaintiff's *economic* interest in exploiting the *market value* of his or her name or likeness, as was the case with the nude modeling photographs there.  *See id.* (right of publicity "characterized by an *economic concern* that individuals be allowed to control the use of their image in order to maximize the *profit* they can receive from its publication") (emphasis added); *id.* at 1206 ("The interest protected . . . is not so much a mental as a proprietary one. . . ."); *id.* at 1207 (protecting "market value" for "which [defendant] would normally pay"); *id.* at 1213 (focusing on "'the commercial exploitation' of [deceased wrestler's] image" and, "[c]rude though the

16

In determining whether Gawker's "use" of plaintiff's image was "commercial," the fact that it sells advertising or makes a profit – like any other media entity – is immaterial.  *See Tyne*, 901 So. 2d at 808-09 ("'That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment.'") (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952)); *see also Bollea*, 2012 WL 5509624, at *3 n.7 (While "Defendants stand to indirectly profit" if the Video "drives additional traffic to Defendants' website," that is true "with respect to any information posted online by any media outlet and is distinguishable from ***selling*** access to the Video solely for the purpose of commercial gain.") (emphasis in original); Dkt. 66 (12/21/12 Order) at 4 (same).  Thus, the only issue here is whether plaintiff's image was used by Gawker to "merely advertise[] a product or service for business purposes."  *Tyne*, 901 So. 2d at 809 (citing *Cardtoons L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959 (10th Cir. 1996)).  Plaintiff does not claim any such thing, and indeed, he cannot.  *See* Compl. ¶¶ 78-80 (alleging defendants' use of "Plaintiff's name, image, identity and persona in connection with" the Gawker Story and Excerpts).[16]

Because plaintiff does not plead facts that would establish a "commercial" use, its publication is both protected by the First Amendment and does not satisfy an essential element of the tort.  *See Valentine v. CBS, Inc.*, 698 F.2d 430, 433 (11th Cir. 1983) (affirming ruling, as a

---

concept may seem in this context," plaintiff's ability to "maximize the *economic benefit* to be derived" from it) (emphasis added).  Nude modeling photographs published in a magazine like *Penthouse*, and used to market it, have a recognized economic value, but excerpts accompanying a related news story do not.  In that regard, plaintiff's ongoing assertions that he has no intention of exploiting the Video – let alone the Excerpts – further undercuts his claim.  *See, e.g.*, Dkt. 66 (12/21/12 Order) at 8 ("This is not a case in which the posting of [the Excerpts] . . . impacts the commercial advantage of controlling the release of those materials.  Indeed, there is no evidence that Plaintiff ever intends to release the Video and, in fact, it is quite likely that Plaintiff seeks to recover [it] for the sole purpose of destroying – not publishing – the" Video.).

[16] Indeed, given the balance between the First Amendment and the misappropriation tort, in a third opinion, the *Michaels* court clarified its order prohibiting sales by IEG, the entity actually *selling* the *full* tape, to permit it "to report on or comment on matters of public interest" or even "to attract attention to IEG as a news medium."  *Michaels v. Internet Entm't Grp., Inc.*, 1998 WL 35242549, at *4-5 (C.D. Cal. Feb. 27, 1998).

matter of law, that publisher did not violate right of publicity where defendants did not use

plaintiff's name to directly promote a product or service); *Tyne*, 901 So. 2d at 809 (dismissing

misappropriation claim for same reason); *Fuentes*, 721 F. Supp. 2d at 1260 (same where plaintiff

could not allege that defendants "used his name and likeness to promote some other product or

service"). As such, plaintiff's claim for common law misappropriation fails as a matter of law

and should be dismissed with prejudice.[17]

### D.      Intentional Infliction of Emotional Distress (Sixth Cause of Action)

As discussed in Part I *supra*, the cause of action for intentional infliction of emotional

distress ("IIED") is particularly disfavored in the First Amendment arena because of the

likelihood that the tort might be used to punish disfavored speech. *See Snyder*, 131 S. Ct. at

1219; *Falwell*, 485 U.S. at 50-51. Even were his claim not constitutionally infirm, plaintiff has

failed to state a claim for IIED, which plaintiff has previously conceded "'may be decided as a

question of law.'" Dkt. 67 (Prior MTD Opp.) at 15-16 (citation omitted).

First, plaintiff has not pled *facts* that would, even if proven true, establish that that

Gawker's conduct was "intentional or reckless" with respect to plaintiff's alleged emotional

distress. *See Lockhart v. Steiner Mgmt. Servs., LLC*, 2011 WL 1743766, at *3 (S.D. Fla. May 6,

2011) (granting motion to dismiss because conclusory assertions that defendant engaged in

"'intentional misconduct designed and intended to cause . . . severe emotional distress'" were

insufficient to state a claim) (citation omitted). Plaintiff's sole factual contention in this regard is

that Gawker refused plaintiff's requests not to publish and, later, to take down, the Excerpts. *See*

---

[17] In *Bollea I*, plaintiff erroneously relied on authorities involving either commercial use or injury. *See* Dkt. 67 (Prior MTD Opp.) at 12-14 & n.9 (relying on *Gritzke v. M.R.A. Holding, LLC*, 2002 WL 32107540, *1 (N.D. Fla. Mar. 15, 2002) (misappropriation claim stated against seller of *Girls Gone Wild* videotape where plaintiff's image was used "on the package of defendant's videotape and in advertisements therefor"); *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562 (1977) (entire commercial value of the plaintiff's act destroyed by defendants' broadcast of key portion, circumstances different than plaintiff's attempt here to punish and enjoin publication, not preserve its commercial value)).

Compl. ¶ 86.  But publishers are regularly subjected to such requests, and plaintiff's theory would expose any publisher who stood on its right to publish to a claim for IIED.  Moreover, where Gawker edited the more than 30-minute Video down to less than two minutes of Excerpts, and included only approximately nine seconds of sexually explicit footage – all in connection with a news report – such conduct is a far cry from the kind of conduct that Florida courts have found to qualify as intentionally or recklessly causing severe emotional distress.  *See, e.g.*, *Nims v. Harrison*, 768 So. 2d 1198, 1200-01 (Fla. 1st DCA 2000) (defendant threatened to kill teacher and rape her children in student newsletter); *Williams v. City of Minneola*, 575 So. 2d 683, 686 (Fla. 5th DCA 1991) (police officers viewed videotape of autopsy of man who died of an apparent drug overdose at officer's home in a "party atmosphere").

Second, plaintiff has not pleaded facts that would establish "outrageous" conduct for purposes of his IIED claim.  "In Florida, '[t]he issue of whether or not the activities of the defendant rise to the level of being extreme and outrageous . . . is a legal question in the first instance for the court to decide as a matter of law.'"  *Vance v. S. Bell Tel. & Tel. Co.*, 983 F.2d 1573, 1575 n.7 (11th Cir. 1993) (quoting *Baker v. Fla. Nat'l Bank*, 559 So. 2d 284, 287 (Fla. 4th DCA 1990)).  Here, the publication of the Gawker Story and the Excerpts, including approximately nine seconds of footage of plaintiff engaged in sexual activity, hardly qualifies, especially in light of plaintiff's own public discussions of his sex life.  *See Moore v. Wendy's Int'l, Inc.*, 1994 WL 874973, at *3-4 (M.D. Fla. Aug. 25, 1994) (granting motion to dismiss based on finding that, although allegations of extreme sexual harassment were "totally inexcusable and unacceptable," they did not qualify as "outrageous" conduct required to establish IIED).  Moreover, because Gawker's conduct – posting a news report accompanied by excerpts – mirrored the conduct approved by the Court in *Michaels II*, it cannot as a matter of

19

law be outrageous.  *See Toffoloni II*, 483 F. App'x at 563-64 (finding no evidence of intentional conduct to support award of punitive damages where defendants believed their use involved a matter of public concern).  Accordingly, plaintiff's IIED claim should be dismissed for this reason as well.  *See Nickerson v. HSNi, LLC*, 2011 WL 3584366, at *3 (M.D. Fla. Aug. 15, 2011) (dismissing IIED claim where conduct alleged, "while perhaps unlawful, [wa]s not sufficiently outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community").

Finally, plaintiff has not pled facts that, if proven, would establish the publication caused him *severe* emotional distress.  His Complaint pleads that "[a]s a proximate result of" defendants' conduct, he "has suffered substantial emotional distress, anxiety and worry."  Compl. ¶ 89.  But these conclusory assertions are insufficient to plead the sort of *severe* emotional distress required to pursue this cause of action.  *See Nickerson*, 2011 WL 3584366, at *3 (granting motion to dismiss where conclusory allegations of emotional distress were insufficient to state IIED claim).  *Cf. Saludes v. Republica de Cuba*, 577 F. Supp. 2d 1243, 1254-55 (S.D. Fla. 2008) (plaintiff sufficiently demonstrated that torture of her son caused her severe emotional distress including "insomnia and constant nightmares since her son was imprisoned").[18]

---

[18] To the extent plaintiff also now pleads injury to his "personal and professional reputation and career," Compl. ¶ 89, such a claim is barred by *Falwell*, which prohibits IIED claims arising out of speech, where such speech would not independently support a defamation claim, *see* 485 U.S. at 50-51.  Here, because the speech was indisputably true – and therefore published without actual malice in the constitutional sense – any alleged injury to reputation may not be redressed through a claim for IIED.  *Id.  See also, e.g., Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999) (in case of broadcast of indisputably true hidden camera footage, rejecting efforts "to recover defamation-type damages under non-reputational tort claims, without satisfying the stricter (First Amendment) standards of a defamation claim" because "such an end-run around First Amendment stricture is foreclosed by" *Falwell*).

### E.      Negligent Infliction of Emotional Distress (Seventh Cause of Action)

Plaintiff has no claim at all for negligent infliction of emotional distress.  Plaintiff previously conceded that, under Florida law, a claim for negligent infliction of emotional distress must flow from actual physical injuries.  *See* Dkt. 4 at 11 (motion for temporary restraining order); Dkt. 5 at 7 (first motion for preliminary injunction); *see also Zell v. Meek*, 665 So. 2d 1048, 1054 (Fla. 1995) ("physical injury" of some kind is an essential element of cause of action).  Despite this concession, plaintiff has nevertheless re-asserted this claim in his new Complaint, despite alleging no such physical injuries.  *See* Fed. R. Civ. P. 11.  Because he has no such claim, he may not assert it for the ostensible purpose of obtaining injunctive relief.  *See Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1098 (11th Cir. 2004) ("[I]f the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise.").  Accordingly, plaintiff's negligent infliction claim should be dismissed with prejudice.

### F.      Florida Statute § 934.10 (Eighth Cause of Action)

Plaintiff alleges that defendants have violated Florida's Wiretap Act by recording the audio portion of the Video and by disseminating the Excerpts.  However, because, as explained *supra*, plaintiff does not allege that Gawker (or any of the other Gawker Defendants) played any role in recording the Video six years ago*, see, e.g.*, Compl. ¶ 26, this claim must fail both as a matter of federal constitutional and state law.  First, under the Constitution, the law is clear that the First Amendment does not permit liability to be imposed for publishing communications about a matter of public concern, even when they were obtained illegally, where, as here, the publisher played no role in the initial illegal interception.  Second, because Gawker had a good faith basis for believing that its conduct was protected by the First Amendment, the statute itself provides a complete defense to liability.

As the Supreme Court explained most recently in *Bartnicki*, 532 U.S. at 528, 535, in finding unconstitutional the analogous "dissemination" provisions of the federal Wiretap Act in similar circumstances, a wiretap statute cannot be constitutionally enforced to punish the *publication* of a communication about a matter of public concern where defendants played no role in *recording* or *intercepting* it.  In *Bartnicki*, a telephone call between two teachers' union officials, discussing possible violence against a school official, was intercepted and recorded in violation of the Wiretap Act.  *Id.* at 518-19.  The recording was then provided to a radio station and a citizens group, each of which disseminated portions of the call.  *Id.*  In the resulting lawsuit, the Court held that, even with respect to information that the radio host and head of the citizens group had "reason to know" was unlawfully obtained, they could not be sanctioned for its disclosure when the information relates to a matter of public concern.  *See id.* at 535 (holding that illegality of how third party acquires information will not "remove the First Amendment shield from criticism of [plaintiff's] conduct") (citations omitted).  Thus, where, as here, the "publisher of information has obtained the information in question in a manner lawful in itself, but from a source who has [recorded] it unlawfully," that "stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern." *Id.* at 528, 535.  Any claimed "right of privacy" in such circumstances cannot constitutionally "'prohibit any publication of matter which is of public or general interest.'"  *Id.* at 534.

Indeed, *Bartnicki* is the latest in a series of Supreme Court decisions finding it unconstitutional under the First Amendment to sanction the retransmission of information that was lawfully obtained even if someone else earlier violated a statute or court order.  *See, e.g.*, *Florida Star v. B.J.F.*, 491 U.S. 524, 541 (1991) (no liability for publication of identity of rape victim when such information was obtained from police report released by law enforcement

agency in violation of Florida statute); *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103-04

(1979) (invalidating West Virginia statute prohibiting publication of identity of juvenile

defendant without first obtaining court order; reiterating that a state cannot restrain a person from

reporting information that he did nothing unlawful in obtaining); *Cox Broadcasting Corp. v.

Cohn*, 420 U.S. 469, 496 (1975) (invalidating Georgia law restricting publication of rape

victim's name because defendant had obtained information lawfully despite statute's prohibition

against its release).

Following *Bartnicki* and its predecessors, the federal Courts of Appeal have repeatedly

held that merely disseminating recordings illegally made by a third party cannot be punished

consistent with the First Amendment.  In *Boehner v. McDermott*, 484 F.3d 573 (D.C. Cir. 2007)

(*en banc*), for example, Judge Sentelle explained in his opinion that the First Amendment

precludes liability on publishers who simply disseminated the contents of an unlawfully

intercepted communication, even if they *knew* the interception was unlawful, *knew* the identity of

the person who intercepted it, and in fact *had personal interactions* with that person:

> The Supreme Court has decided the first issue in this case, that is whether the
> United States . . .  can constitutionally bar the publication of information
> originally obtained by the unlawful interception but otherwise lawfully received
> by the communicator in the negative.  We venture to say that an opposite rule
> would be fraught with danger. . . .  [E]very reader of the information in the
> newspapers also learned that it had been obtained by unlawful intercept.  Under
> the rule proposed by [plaintiff], no one in the United States could communicate on
> this topic of public interest because of the defect in the chain of title.  We do not
> believe the First Amendment permits this interdiction of public information either
> at the stage of the newspaper-reading public [or] of the newspaper-publishing
> communicators.

*Id.* at 586 (opinion of Sentelle, J.).[19]  *See also Jean v. Mass. State Police*, 492 F.3d 24, 29-30 (1st Cir. 2007) (affirming First Amendment protection for publication of unlawfully recorded videotape of warrantless residential search that had been provided to community activist who then posted video on the Internet).

Wholly apart from this constitutional bar, the Florida wiretap statute on its face provides a "complete defense" based on a "good faith reliance" on a "good faith determination that Florida or federal law . . . permitted the conduct complained of."  Fla. Stat. § 934.10(2)(c); *see also, e.g.*, *Minotty v. Baudo*, 42 So. 3d 824, 831 (Fla. 4th DCA 2010) ("Chapter 934 was modeled after the Federal Wiretap Act, 18 U.S.C. § 2510 *et seq.* . . .  Florida follows federal courts as to the meaning of provisions after which Chapter 934 was modeled.").  Given that Gawker is certainly entitled to rely on U.S. Supreme Court authority declaring unconstitutional the imposition of liability under the federal counterpart to the Florida statute in analogous circumstances, plaintiff also cannot state a claim against Gawker under the Florida act's statutory terms.[20]

---

[19] Judge Sentelle's opinion dissented from the Court's ruling upholding the entry of summary judgment against Representative McDermott only because he, unlike the newspaper defendants, had violated a legal duty imposed on him as a member of the House Ethics Committee to maintain the confidentiality of information provided to him in that capacity.  *See* 484 F.3d at 581.  However, as to the principles announced in *Bartnicki* as they apply here, Judge Sentelle's opinion spoke for a majority of the *en banc* Court.  *See* 484 F.3d at 582 ("On the issue considered by the Supreme Court in *Bartnicki*, . . . this opinion speaks for the court.") (opinion of Sentelle, J.); *id.* at 581 ("a majority of the members of this Court . . . join Part I of Judge Sentelle's dissent") (Griffith, J., concurring).

[20] In his Complaint, plaintiff also alleges that he is "informed and believes" that defendants' conduct is actionable in part because dissemination of the Excerpts constitutes a felony under Florida's Video Voyeurism Act.  *See* Compl. ¶ 4.  Putting aside the constitutional bar for enforcing such a provision in these circumstances, as discussed in *supra*, his invocation of this Act fails for two additional reasons.  First, the statute does not create a private right of action and he has not asserted one.  *See Kamau v. Slate*, 2012 WL 5390001, at *9 (N.D. Fla. Oct. 1, 2012).  Second, the statute does not apply on its face because: (a) at the time the Video was recorded six years ago, the statute did not apply to recordings made in the "interior of a residential dwelling" (that language was added in 2012, *see* Amended Notes to Fla. Stat. § 810.145); and (b) therefore any "dissemination" was not "knowing" or with "reason to believe" that the Video was "created" in violation of the statute, as required by Fla. Stat. § 810.145(4)(a).  *See also id.* § 810.145(5)(c) (exception for surveillance cameras known to the person recorded).

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiff's Complaint should be dismissed in its entirety as to

Gawker (and each of the other Gawker Defendants).[21]

<div style="margin-left:40%">

Respectfully submitted,

THOMAS & LOCICERO PL

By:   /s/ Gregg D. Thomas

    Gregg D. Thomas
    Florida Bar No.: 223913
    Rachel E. Fugate
    Florida Bar No.: 0144029
400 North Ashley Drive, Suite 1100
P.O. Box 2602 (33601)
Tampa, FL 33602
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
gthomas@tlolawfirm.com
rfugate@tlolawfirm.com

</div>

<u>Of Counsel</u>:
Seth D. Berlin (*pro hac vice* motion forthcoming)
Paul J. Safier (*pro hac vice* motion forthcoming)
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1899 L Street, NW, Suite 200
Washington, DC 20036
Telephone: (202) 508-1122
Facsimile: (202) 861-9888
sberlin@lskslaw.com
psafier@lskslaw.com

<div style="margin-left:40%">

*Counsel for Defendant Gawker Media, LLC*

</div>

---

[21] Plaintiffs' claims against the other Gawker Defendants fail for the same reasons as set forth above.  In addition, with respect to the other entities, plaintiff has not alleged any actionable conduct by them or conduct in or directed to Florida such that the Court would have jurisdiction over them.  In the event that the other Gawker Defendants are ultimately served, it is anticipated that they would move to dismiss on both of those grounds as well, as they did in *Bollea I*.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 4th day of January 2013, a true and correct copy of the

foregoing is being electronically filed and will be furnished via CM/ECF to:

Kenneth G. Turkel, Esq.
kturkel@BajoCuva.com
Christina K. Ramirez, Esq.
cramirez@BajoCuva.com
Bajo Cuva Cohen & Turkel, P.A.
100 N. Tampa Street, Suite 1900
Tampa, FL 33602
Tel: (813) 443-2199
Fax: (813) 443-2193

*Counsel for Plaintiff*

Barry A. Cohen, Esq.
bcohen@tampalawfirm.com
D. Keith Thomas
dkthomas@tampalawfirm.com
Barry A. Cohen Law Group
201 East Kennedy Boulevard, Suite 1000
Tampa, FL 33602
Tel: (813) 225-1655
Fax: (813) 225-1921

*Counsel for Defendant Heather Clem*

and served by mail and email on:

Charles J. Harder, Esq.
charder@HMAfirm.com
Harder Mirell & Abrams LLP
1801 Avenue of the Stars, Suite 1120
Los Angeles, CA 90067
Tel: (424) 203-1600
Fax: (424) 203-1601

*Co-Counsel for Plaintiff*

Michael W. Gaines
mgaines@tampalawfirm.com
Barry A. Cohen Law Group
201 East Kennedy Boulevard, Suite 1000
Tampa, FL 33602
Tel: (813) 225-1655
Fax: (813) 225-1921

*Co-Counsel for Defendant Heather Clem*

/s/ Gregg D. Thomas
Attorney